UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | CAUSE NO. 3:08-CR-00051(01) RM |
| ) | |
| GERALD RZEPCZYNSKI ) | |

OPINION AND ORDER

This cause came before the court on March 3, 2009 for hearing on the defendant's motion to suppress evidence resulting from his arrest and questioning in March 2008. For the reasons that follow, the court grants the motion with respect to one statement, but denies the motion in all other respects.

Gerald Rzepczynski, then aged 51, was arrested for the first time in his life late in the evening of March 19, 2008. Several years earlier, the local utility had wronged Mr. Rzepczynski, in his view, to the tune of several thousand dollars. Starting with the evening of March 17, Mr. Rzepczynski began taking revenge on the utility by firing shots at its new office building as he drove home from work late at night. These shootings concerned LaPorte County Sheriff's Officer (now Detective) Brett Swanson because his wife worked in that building. After the building had been fired on for two consecutive nights, Det. Swanson traded assignments with another officer so he could watch the building.

Around 11:40 p.m. on March 19, Mr. Rzepczynski fired on the building again. He slowed his Geo Metro in front of the building and fired once. He had fired eight or nine times each of the previous nights, but his gun jammed on

March 19, so he accelerated and drove away. Det. Swanson heard a "pop" that sounded like a gunshot, so he gave chase and pulled Mr. Rzepczynski over.

With good reason to believe that Mr. Rzepczynski was an armed felon, the uniformed Det. Swanson got out of his marked car with his gun drawn and ordered Mr. Rzepczynski out of the Geo. He ordered Mr. Rzepczynski to his knees, handcuffed him, then checked Mr. Rzepczynski's car for other occupants. There were none. Det. Swanson returned to Mr. Rzepczynski, helped him to his feet, and asked if Mr. Rzepczynski had any weapons in the car. Mr. Rzepczynski responded that there was a .22 by the locked passenger door, so Det. Swanson would have to enter through the driver's side. There was also, Mr. Rzepczynski said, a Taser and a derringer. Det. Swanson retrieved each item pursuant to the Sheriff's Department's inventory policy. A homemade suppressor was attached to the .22 caliber pistol.

Finally caught, Mr. Rzepczynski was eager to tell his story. Det. Swanson was waiting for assistance to arrive and wanted Mr. Rzepczynski to wait until they got to the station, so he urged Mr. Rzepczynski not to say anything. Unable to wait, Mr. Rzepczynski said in the patrol car on the way to the station, without urging or incentive from Det. Swanson, that he had screwed up and shot at the utility building. At one point in the conversation, Det. Swanson asked Mr. Rzepczynski if the utility company had cut off Mr. Rzepczynski's electricity. Mr. Rzepczynski said there was more to it than that. Det. Swanson again told Mr. Rzepczynski to say nothing until they got to the station.

Mr. Rzepczynski was booked in the jail at 12:23 a.m. on three Class C felony recklessness charges and taken into a conference room. Det. Swanson read him each of his *Miranda* rights. and Mr. Rzepczynski initialed them and executed a waiver. In a twenty-minute interrogation, a very cooperative Gerald Rzepczynski admitted to shooting at the utility building on each of the previous three nights. He explained that he had acted out of revenge because the utility owed him money from a few years back. Mr. Rzepczynski was so forthcoming that Det. Swanson struggled to think of questions to ask. No promises or threats were made. Det. Swanson allowed Mr. Rzepczynski to call his wife, who worked a block away at a hospital. She appears to have been quite displeased with Mr. Rzepczynski's choice of conduct.

The LaPorte County Jail has a bond schedule issued by the circuit judge. The schedule identifies the amount of bond required for release, depending on the seriousness of the charge on which an inmate is being held. A Class C felony, such as the three criminal recklessness charges on which Mr. Rzepczynski was arrested, carries a $2,000 cash bond. A Class A felony, the most serious crime covered by the schedule, carries a $15,000 cash bond. There is uncorroborated evidence that a bond can be posted by credit card. The court is hesitant to accept this uncorroborated evidence as true because a charge on one's credit card seems a peculiarly weak tether to assure appearance by one whose individual risk hasn't been evaluated. In any event, Mr. Rzepczynski had with him, at the time of his arrest, a credit card with a $2,500 balance. Booking paperwork variously shows

3

Mr. Rzepczynski's requisite bond at $15,000, "$0.00 NB" (which would seem to mean no bond), and $2,000.

Mrs. Rzepczynski called the jail to ask about her husband's bond. At some point, someone told her she couldn't bond him out until federal ATF agents spoke with him. It wasn't until nearly 9:00 a.m. that Mrs. Rzepczynski learned she could post a $2,000 bond for Mr. Rzepczynski. She went to the bank for the money, then went to the jail and procured her husband's release.

Mr. Rzepczynski believes he was told at his booking that he couldn't post bond until after the ATF spoke with him. Mr. Rzepczynski was booked at around 12:23 a.m. Yet it wasn't until 1:00 a.m. or so that county police Captain Pierce called a sleeping ATF Special Agent Kevin O'Malley at his home to tell him the police had a person who had been shooting a firearm with a suspected silencer. Special Agent O'Malley asked if he should come immediately or wait until the morning, and Capt. Pierce said he could come in the morning.

Special Agent O'Malley met with Mr. Rzepczynski in the company of Sheriff's Department Detective Al Ott at 8:00 a.m. at the county jail. In a videotaped interview, Special Agent O'Malley painstakingly reviewed the *Miranda* warnings with a cooperative and affable Gerald Rzepczynski. After Mr. Rzepczynski signed the waiver, an interview occurred in which Mr. Rzepczynski forthrightly explained where he got the firearms, why and how he made the silencer, and the purpose for which he used the guns. Although Mr. Rzepczynski got little sleep between the Swanson interview and the O'Malley interview, he didn't appear tired or groggy.

4

During the interview, Mr. Rzepczynski asked at one point about his bond, and Det. Ott said he would find out about it.

Mr. Rzepczynski raises two principal arguments in support of his suppression motion. First, he contends that the Swanson interview was the result of custodial interrogation by Det. Swanson at the scene and in the car before anyone informed Mr. Rzepczynski of his *Miranda* rights. Second, he contends that the police improperly manipulated Mr. Rzepczynski's opportunity to post bond, making the O'Malley interview involuntary. Neither argument is persuasive under these facts.

The rule of Miranda v. Arizona, 384 U.S. 436 (1966), requires exclusion from evidence of any statements made by a suspect during a custodial interrogation unless the suspect was informed of, and waived, specified constitutional rights. *See, e.g.*, United States v. Podhorn, 549 F.3d 552 (7th Cir. 2008). Miranda doesn't govern only direct questions; it also covers "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). On the other hand, the Miranda rule doesn't require exclusion of volunteered statements that weren't made pursuant to custodial interrogation. United States v. Hendrix, 509 F.3d 362, 374 (7th Cir. 2007); United States v. Abdulla, 294 F.3d 830, 835 (7th Cir. 2002).

Det. Swanson asked no questions at the scene of the traffic stop. Nonetheless, Mr. Rzepczynski volunteered that he had shot at the building that

5

night and on each of the previous two nights. Mr. Rzepczynski was eager to explain himself. In the car on the way to jail, Mr. Rzepczynski continued to volunteer statements about his shooting. At nearly all times, Det. Swanson told Mr. Rzepczynski not to talk until they reached the jail. But at some point during the trip, Det. Swanson asked if Mr. Rzepczynski did what he had confessed to doing because his electricity was cut off. Mr. Rzepczynski responded not with an admission or even a denial, *see* Smiley v. Thurmer, 542 F.3d 574, 583 (7th Cir. 2008), but with a statement that it wasn't that simple. That single statement, made in police custody in response to a question, must be suppressed. Id.

Any custodial interrogation before Miranda rights is impermissible, but Det. Swanson's single question provides no ground for suppression of the jailhouse interview. Mr. Rzepczynski said nothing that furthered the investigation or let any cat out of the bag. He already had told Det. Swanson that he shot at the utility building each of the nights in question. He was eager to tell why he had done so. He was eager to do so before the question and when they arrived at the jail. Proper warnings were given before the custodial interrogation at the jail, and Mr. Rzepczynski's statements in response to that questioning were entirely voluntary. As in United States v. Abdulla, 294 F.3d 830, 835-837 (7th Cir. 2002), this modest offense against Miranda doesn't require suppression of Mr. Rzepczynski's voluntary post-*Miranda* statements to Det. Swanson.

The county sheriff didn't afford Mr. Rzepczynski the opportunity to post bond according to the bond schedule until Agent O'Malley arrived and spoke with

6

Mr. Rzepczynski, but the sheriff violated no constitutional provision in doing so. A person arrested on felony charges without a warrant is entitled to a judicial determination of probable cause as a prerequisite to extended restraint. Gerstein v. Pugh, 420 U.S. 103, 114 (1975). Authorities may hold a person for a brief period to take necessary administrative steps before the hearing. *See* County of Riverside, 500 U.S. 44 (1991). Ordinarily, a defendant may be detained overnight to allow interviews with the defendant concerning the events giving rise to the arrest, United States v. Rivera, 370 F.3d 730, 734 (8th Cir. 2004), though such a delay becomes unconstitutional when the investigation continues for days on end. *See, e.g.*, Lopez v. City of Chicago, 464 F.3d 711, 721-722 (7th Cir. 2006) (five days). The suppression record contains no hint that the sheriff could have taken Mr. Rzepczynski before a magistrate between his 12:23 a.m. booking and the O'Malley interview, which began between 8:00 a.m. and 9:00 a.m. If the sheriff acted wrongly in holding Mr. Rzepczynski until the O'Malley interview despite the bond schedule, it wasn't wrong because of any federal constitutional provision.

Mr. Rzepczynski's statement to Special Agent O'Malley was entirely voluntary. Mr. Rzepczynski was 51 years old, of reasonable intelligence, alert and cooperative, and aware of his Miranda rights; the interrogation took less than an hour, was cordial on everyone's part, and Mr. Rzepczynski was given something to drink. *See* Conner v. McBride, 375 F.3d 643, 651 (7th Cir. 2004).

Mr. Rzepczynski's response to Det. Swanson's single question before reading Mr. Rzepczynski's Miranda rights must be suppressed, but no basis exists to

suppress the statements Mr. Rzepczynski said in either the interview with Det. Swanson or the interview with Special Agent O'Malley. The court GRANTS the defendant's suppression motion to the extent he seeks to suppress his statement in the squad car concerning his reasons for shooting at the utility building, but DENIES the motion in all other respects.

SO ORDERED.

ENTERED:    March 9, 2009

                                /s/ Robert L. Miller, Jr.
                             Chief Judge
                             United States District Court